The Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| ANDRE THOMPSON, a single man; and BRYSON CHAPLIN, a single man, | NO.  3:18-cv-05267 |
| Plaintiffs, | PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| Vs. | |
| CITY OF OLYMPIA,  a local government entity; and RYAN DONALD and "JANE DOE" DONALD, individually and the marital community comprised thereof, | NOTE ON MOTION CALENDAR: FRIDAY, DECEMBER 7, 2018 |
| Defendants. | |

## I.  INTRODUCTION

Defendants' motion for summary judgment attempts to mislead the Court with multiple statements of supposed undisputed "fact", when in reality almost every such "fact" is contested and was contradicted by evidence developed during the criminal investigation or testimony given under oath during the Plaintiffs' underlying criminal trial or by declaration. There are genuine issues of material fact as to whether the circumstances warranted the use of deadly force by Officer Donald in this case, and it is clear that Officer Donald should

PLAINTIFFS' BRIEF IN OPPOSITION
3:18-CV-05267-RBL
Page 1 of 24
ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet
files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1    have known that doing so was a violation of established law.  Granting summary judgment

2    would be inappropriate, and Plaintiffs request that the motion be denied.

3        To avoid filing an over-length brief, but because Plaintiffs believe they need to advise

4    the Court in some detail of the relevant and material facts in dispute that were not presented

5    by Defendants, Plaintiffs submit and incorporate by reference the Declaration of Sunni Ko,

6    which contains not only the evidence cited below but also a chart for the Court's use

7    demonstrating Defendants' allegations versus the extensive contradictory evidence.

8                    **II.  RELEVANT FACTUAL SUMMARY**

9    a.      <u>**Event and Procedural History:**</u>

10       On May 21, 2015, at approximately 1:15:48 a.m., Officer Ryan Donald of the

11   Olympia Police Department reported to dispatch that he had spotted two suspects with

12   skateboards on Cooper Point Road in Olympia Washington. *Declaration of Sunni Ko, Ex*

13   *"1" (CAD Report& Trnscpt. of Radio Transmissions).* Less than a minute later, Officer

14   Donald reported shots had been fired and that possibly one suspect had been hit. *Id.*  He

15   requested assistance and told dispatch the suspects had fled into a wooded area adjacent to

16   Cooper Point Road.  *Id.*  When other officers arrived, they found Mr. Bryson Chaplin

17   unresponsive and Mr. Andre Thompson shot in his abdomen and in complete disbelief he

18   and his brother had been shot. *Decl. of Ko, Ex. "5", at p. 3 (Trnscpt. of Evers).*

19       At St. Peter Hospital, Mr. Chaplin was determined to have sustained multiple

20   gunshot wounds, one bullet shattering his spinal column. *Decl. of Ko, Ex. "11".*  A bullet

21   had struck his 11th spinal vertebrae, shattering the vertebral column and injuring his spine

22

23

24   PLAINTIFFS' BRIEF IN OPPOSITION
     3:18-CV-05267-RBL

25   Page 2 of 24
     ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet
26   files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1   with a fragment lodging next to the column.   Mr. Chaplin was immediately airlifted to

2   Harborview Medical Center and was told he would never be able to walk again.

3       Almost two years after the incident, in May 2017, the matter proceeded to trial.   The

4   trial lasted six weeks, and during the trial, over 30 witnesses testified on behalf of the State,

5   with Officer Donald as its star witness.   Throughout the trial, the State's key forensic

6   witnesses, Kristopher Kern and Kathy Geil of the Washington State Patrol Crime

7   Laboratory, actually refuted the testimony given by Officer Donald. *Decl. of Ko, Exs. "24"*

8   *and "22", respectively.*   The physical evidence presented at trial refuted the testimony

9   given by Officer Donald.   Defense experts, Dr. John Lacy and Mr. Kay Sweeney, also

10  refuted the testimony given by Officer Donald. *Decl. of Ko, Exs. "27" and "23",*

11  *respectively.*

12      Mr. Thompson and Mr. Chaplin did not testify on their own behalf at their criminal

13  trial.   Their sister, Jasmine Thompson, who had witnessed Officer Donald shooting her

14  brother Andre Thompson did not testify, though she had been interviewed by police. *Decl.*

15  *of Ko, Ex. "31".*

16      After days of deliberation, after numerous notices that the jury could not reach

17  unanimous decisions on counts I and II, the jury ultimately found each brother guilty of one

18  count of assault in the 3rd degree on Count II – a lesser included crime of assault in the 2nd

19  degree.

20      As more fully articulated below, the facts as alleged by Officer Donald are clearly

21  disputed by Andre Thompson and Bryson Chaplin.   See *Decl. of Ko, Exs. "4", "18", and*

22

23

24  PLAINTIFFS' BRIEF IN OPPOSITION
    3:18-CV-05267-RBL
25  Page 3 of 24
    ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet
26  files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1    *"30" (Declarations of Andre Thompson, Bryson Chaplin, and Jasmine Thompson,*

2    *respectively).*  The forensic evidence also refutes the claims made by Officer Donald.

3    **b.**    **Officer Donald's Testimony**

4        Officer Donald claims when he commanded that Plaintiffs take a seat in front of his

5    patrol vehicle, the two men rapidly approached the passenger side of his vehicle.  *Decl. of*

6    *Ko, Ex. "2", at pp. 184, 186.*  He testified that the man in the dark colored shirt [Bryson

7    Chaplin], raised his skateboard above his head as he started running towards Officer

8    Donald's patrol vehicle.  *Id., at p. 191.*  He then testified that when Mr. Thompson and

9    Mr. Chaplin were at the right rear passenger side of the patrol vehicle, Mr. Thompson

10   suddenly and unexpectedly grabbed Officer Donald's right arm and began spinning him

11   around.  *Id., at pp. 206, 210, 223, 225 – 26.*

12       Officer Donald testified that he was caught totally by surprise *(Id., at p. 210)* and

13   was unable to defend himself from Mr. Thompson's attack.  *Id., at pp. 210, 215 - 16, 225 –*

14   *26.*  Officer Donald testified that all he could do was make unsuccessful attempts to pull his

15   arm free and regain his balance.  *Id.*  As he continued to struggle with Mr. Thompson

16   without success, Officer Donald testified that Mr. Thompson somehow was able to bend

17   Officer Donald's body at a 45 degree angle in a "hunched over or bent-over position,"

18   forcing his head near Mr. Thompson's "chest height."  *Decl. of Ko, Ex. "2", at pp. 225 –*

19   *26.*  Meanwhile, while "attempting to pull away, pull back and away from the subject

20   holding onto [him]," as he was being "pulled to the ground" and "thrown off balance,"

21   Officer Donald testified he observed Mr. Chaplin standing directly behind him with his

22   skateboard raised above his head "lined-up with [his] head," ready to strike.   *Id., at pp.*

23

24   PLAINTIFFS' BRIEF IN OPPOSITION
     3:18-CV-05267-RBL

25   Page 4 of 24
     ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet
26   files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1   *225, 229-30, 232.*  Fearing for his life, Office Donald testified he removed his firearm from

2   his left holster with his left hand, placed his left hand underneath his right arm/armpit, and

3   fired an unknown number of rounds, although he missed hitting his targets.  *Id., at pp.*

4   *231, 234 – 36, 452.*   Officer Donald had no explanation as to how he could have missed

5   Mr. Chaplin when Mr. Chaplin had been standing "very close" – "within a foot or two"

6   from Officer Donald, Mr. Chaplin's torso was clearly visible to Officer Donald, and Officer

7   Donald was aiming for "center mass". *Id., at pp. 232, 455.*   All of this occurred with 51

8   seconds, according to Officer Donald.

9        Officer Donald notified dispatch multiple times that the two suspects had fled into

10  the woods, although he had "lost sight of them as they ran northbound" as the area was

11  "very dark" and "there were no street lights illuminating the roadway"[.]  *Decl. of Ko, Ex.*

12  *"1".*   Rather than stay near his vehicle and wait for backup, Officer Donald testified he

13  pursued the two suspects who had allegedly just attacked him without provocation and had

14  attempted to strike him with a skateboard.  *Decl. of Ko, Ex. "2", at pp. 241-43.*   As he

15  stood near the guardrail with his gun drawn and his flashlight pointed into the wood line,

16  Officer Donald failed to notice another patrol vehicle arrive at the scene with its lights and

17  siren blaring.  *Decl. of Ko, Ex. "2", at p. 2.*   Less than a minute later, Officer Donald

18  notified dispatch he shot two men and assistance were needed.  *Decl. of Ko, Ex. "1".*

19       Officer Donald later testified he shot Mr. Chaplin when he was about 5 feet away

20  from him because Mr. Chaplin came at him with his skateboard raised above his head.

21  *Decl. of Ko, Ex. "2", at p. 286.*   He testified that he warned Mr. Chaplin he was going to

22  discharge his weapon before firing his gun.  *Id., at p. 701.*   After he shot Mr. Chaplin,

23

24  PLAINTIFFS' BRIEF IN OPPOSITION
    3:18-CV-05267-RBL

25  Page 5 of 24
    ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet

26  files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1    Officer Donald testified that Mr. Chaplin stumbled couple feet and began "rolling around

2    quite a bit." *Id., at pp. 561 – 562.*

3         Officer Donald testified that after he shot Mr. Chaplin, Mr. Thompson began

4    "taking very large steps" towards him, ignoring his commands to stop. *Id., at p. 301.* He

5    claimed that Mr. Thompson got close enough to reach for Officer Donald's gun, and

6    Officer Donald could see Mr. Thompson's eyes glancing at his weapon. Officer Donald

7    pulled his weapon, and he testified that Mr. Thompson was close-enough that Officer

8    Donald could not even extend his arm out to support a full shooting position. Officer

9    Donald then fired multiple times at Mr. Thompson, one bullet striking his abdomen. *Id., at*

10   *pp. 565-66.* He told the jury he warned Mr. Thompson he was going to shoot, that he was

11   going to discharge his weapon before he fired multiple times. *Id., at p. 702.*

12        c.    **<u>Witnesses Testimony Disputing Officer Donald's Testimony</u>**

13        Mr. Andre Thompson and Mr. Bryson Chaplin state that they were walking north on

14   Cooper Point Road heading home after Mr. Chaplin stole some beer at a local Safeway

15   grocery store. While walking, they noticed a vehicle pull-over onto the shoulder of the road

16   southbound on Cooper Point Road. *See Decl. of Ko, Exs. "4" and "18".* Because the

17   vehicle did not have the classic emergency lights turned on but only a spotlight pointed in

18   their direction, they suspected it could be a campus security officer attempting to make

19   contact. Then they heard a male voice whom they could not see commanding them to take

20   a seat in front of the vehicle. To avoid confrontation, they began running across Cooper

21   Point Road when they heard the person yell, "Olympia Police!" "Stop!" They did not stop;

22   they continued running. *Decl. of Ko, Exs. "4" and "18".*

23

24   PLAINTIFFS' BRIEF IN OPPOSITION
     3:18-CV-05267-RBL

25   Page 6 of 24
     ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet

26   files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1    As they ran north on Cooper Point Road, Mr. Thompson and Mr. Chaplin heard

2   multiple gunshots.  They had no idea if they were being shot at intentionally or if the shots

3   were fired merely as a warning.  *Decl. of Ko, Exs. "4" and "18".*  In fear for their lives, and

4   thinking they would be better protected in the wooded area next to the house on the west of

5   Cooper Point Rd, Mr. Thompson began running in the direction of the woods with Mr.

6   Chaplin following in close pursuit.  *Decl. of Ko, Ex. "4".*  They were running in near

7   complete darkness, and Mr. Thompson struck a recycling bin sitting curbside and dropped

8   his skateboard.  He continued on without it.  *Decl. of Ko, Ex. "4".*

9    While running north in the woods, they heard the siren of another patrol vehicle and

10   knew there were other officers coming to the scene.  They also heard loud noises

11   approaching from the north.  Believing they were about to be cornered, they turned around

12   and ran back in the direction from which they had come.  *Decl. of Ko, Exs. "4" and "18."*

13    Mr. Thompson was the first to emerge out of the bushes and onto Cooper Point

14   Road, with Mr. Chaplin following closely behind.  As Mr. Thompson started running across

15   the road, he heard an officer shout, "Stop!" "Get down!  *Decl. of Ko, Ex. "4."*  Believing

16   that this was the same officer who had already fired his weapon at them, Mr. Thompson

17   stopped running.  Mr. Thompson heard, "Stop!" "Get on the ground!"  "Get down!"  As he

18   turned to look back, he saw Mr. Chaplin emerging out of the woods onto the shoulder of

19   the road; this was immediately followed by multiple gunshots.   To his horror, Mr.

20   Thompson watched his brother fall to the ground.  *Decl. of Ko, Ex. "4."*  There were no

21   shouts from Officer Donald he was going to shoot. *Decl. of Ko, Ex."4".[1]*

22   _____

23   [1] Of note, not one of the 30 civilian witnesses who were interviewed ever told police they heard anyone shout that he was going to shoot before shots were fired, and no a single witness at trial testified he or she

24   PLAINTIFFS' BRIEF IN OPPOSITION
3:18-CV-05267-RBL
25   Page 7 of 24
ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet
26   files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1    While watching his brother lying motionless next to the fog line, Mr. Thompson

2    took several steps towards his brother before he was ordered to stop.    Immediately he

3    stopped, and turned to face Officer Donald.  ***Decl. of Ko, Ex. "4".***  He was in shock that

4    Officer Donald had shot and possibly killed his brother.  Mr. Thompson stood motionless,

5    shouting, "Bro!" "Bro!" "Bro!"  He then yelled, "Why the f*** did you shoot my brother?"

6    and "Are you going to shoot me too?" ***Decl. of Ko, Ex. "4".***

7    As he stood in the middle of the road yelling at Officer Donald, Officer Donald

8    began slowly walking towards Mr. Thompson Officer Donald yelled, "Get down!"  "Get on

9    the ground!" ***Decl. of Ko, Ex. "4".***  Before Mr. Thompson could move, Officer Donald

10    (again without warning) shot him in the abdomen, and Mr. Thompson fell to the ground.[2]

11    ***Decl. of Ko, Ex. "4".***

12    Coincidently, and unbeknownst to Mr. Thompson at the time, his sister Jasmine

13    Thompson and her ex-boyfriend were driving towards home on Cooper Point Road right

14    then after leaving Capital Medical Center when they heard what they believed were three

15    gunshots. ***Decl. of Ko, Ex. "30".***  Ms. Thompson, who had been reclining in her passenger

16    seat with her eyes closed, immediately sat up to see from whom the shots were fired.  When

17    she looked around, she saw a police officer [Officer Donald] standing in the northbound

18    lane on Cooper Point Road with his firearm drawn and his flashlight on.    At first, she

19    

---

20    heard Officer Donald shout he was going to discharge his weapon, contradicting Officer Donald's
testimony.

21    [2] Contrary to Officer Donald's statements that he warned Mr. Chaplin and Thompson he was going to shoot
if they did not follow his commands, Officer Paul Evers, one of the other officers on the scene, stated

22    during his interviews that he heard Officer Donald giving commands to "stop" and to "get on the ground"
before Officer Donald shot Andre Thompson, but he never heard Officer Donald yell that he would shoot.

23    Decl. of Ko, Ex. "25" at p. 26.

24    PLAINTIFFS' BRIEF IN OPPOSITION
3:18-CV-05267-RBL

25    Page 8 of 24
ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet

26    files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1  believed Officer Donald was attempting to stop their vehicle, and they immediately pulled

2  over.   However, Officer Donald walked past their vehicle, moving southbound, so they

3  pulled back onto the road heading north.  *Decl. of Ko, Ex. "30".*  When Ms. Thompson

4  looked to see what Officer Donald was focused upon, she noticed a male figure in a white

5  T-shirt standing further down Cooper Point Road near the centerline.  She did not know at

6  the time this man in the white T-shirt was her brother Andre.

7      As her vehicle drove further north, Jasmine Thompson's eyes remained transfixed

8  on the two figures as she watched Officer Donald moving slowly towards the man in the

9  white T-shirt.  She watched in disbelief as she saw the man fall to the ground after Officer

10  Donald fired multiple shots in his direction. *Decl. of Ko, Ex. "30".*  What haunts her still is

11  the memory of seeing the man clearly weaponless as Officer Donald's flashlight illuminated

12  his hands.  *Decl. of Ko, Ex. "30".*

13  d.      **Forensic Evidence Refuting Officer Donald's Testimony**

14      In addition to witness testimony, there was significant forensic testimony refuting

15  Officer Donald's testimony.  To begin with, defense crime scene reconstruction expert, Mr.

16  Kay Sweeney, testified that based on the trajectory of the bullet strikes, the grassy depression

17  adjacent to the fence line[3], the location of the patrol vehicle, the location of the three casings

18  on the passenger side of the patrol vehicle, and the ejection pattern of Officer Donald's

19  firearm, Officer Donald was standing next to the fence north of the patrol vehicle facing east

20  while firing his gun at a downward angle in the northeast direction, contrary to Officer

21  Donald's testimony about being spun around and grabbed by Mr. Thompson as he

22

23  [3] Sergeant Brady noted footprints in the grassy depression. *Decl. of Ko, Ex. "Z".*

24  PLAINTIFFS' BRIEF IN OPPOSITION
   3:18-CV-05267-RBL

25  Page 9 of 24
   ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet

26  files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1   discharged his firearm. *Decl. of Ko, Ex. "23" at pp. 61 – 67, including Photos and*
2   *Diagrams Admitted During Trial.*

3       When asked whether the cartridge casings would have landed on the passenger side
4   of the patrol vehicle if the shooter was bent-over at a 45 degree angle with his shooting left
5   arm underneath his right armpit, aiming at a target standing behind and above him, the
6   State's crime scene reconstruction expert from the Washington State Crime Laboratory, Mr.
7   Kristopher Kern, stated, "I think that's a stretch potentially," *Decl. of Ko, Ex. "24" at p.*
8   *149*.

9       The State's firearms expert, Ms. Kathy Geil, testified that if Officer Donald was
10  behind the rear of his patrol vehicle firing his weapon in a northeast direction, thus creating
11  the three bullet strikes on the road, and if the casings are ejected to the right from the
12  ejection portal, the casings would have landed to the "center of the road" and not on the
13  passenger side of the patrol vehicle on the grassy strip adjacent to the fence line.  This is
14  contrary to what Officer Donald stated about the direction the muzzle of his gun was facing
15  when he discharged his firearm. *Decl. of Ko, Ex. "22", at pp. 128 – 29.*

16      Dr. John Lacy testified the gunshot wound that shattered Mr. Chaplin's spinal
17  column was "immediately incapacitating."  He testified, "It's very unlikely that you're going
18  to have much movement after this, and I think it's probably more likely than not that he
19  would have collapsed right way," contrary to Officer Donald's testimony that Mr. Chaplin
20  stumbled a couple feet, tumbled and rolled from side to side. *Decl. of Ko, Ex. "27", at p.*
21  *74.* Additionally, defense expert Mr. Kay Sweeney testified he observed no signs of Mr.
22  Chaplin stumbling or tumbling after he was shot. *Decl. of Ko, Ex. "23", at p. 188.*  Mr.

23

24  PLAINTIFFS' BRIEF IN OPPOSITION
    3:18-CV-05267-RBL
25  Page 10 of 24
    ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet
26  files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

    **DAVIES PEARSON, P.C.**
    ATTORNEYS AT LAW
    920 FAWCETT -- P.O. BOX 1657
    TACOMA, WASHINGTON 98401
    TELEPHONE (253) 620-1500
    TOLL-FREE (800) 439-1112
    FAX (253) 572-3052

1   Kern also testified Mr. Chaplin would have had to stumble back nearly 20 feet to fall next to

2   the fog line if Officer Donald was standing at the center line and Mr. Chaplin had been

3   approximately five feet away when shots were fired. *Decl. of Ko, Ex "24" at pp. 121 –*

4   *122.*

5          Ms. Geil testified that the drop-off distance for Officer Donald's gun was 48 inches,

6   and Mr. Sweeney testified he observed no gunshot residue on Mr. Thompsons' white T-

7   shirt.  Hence, Mr. Sweeney concluded that Mr. Thompson was *more* than 48 inches away

8   from the muzzle of Officer Donald's firearm when he was shot in the abdomen, again

9   contrary to Officer Donald's testimony that Mr. Thompson was within reaching distance to

10  his firearm when Officer Donald shot him. *Decl. of Ko, Ex. "23", at p. 196.*

11              **III.     EVIDENCE RELIED UPON**

12          A.      Declaration of Sunni Ko, with exhibits.

13              **IV.     LEGAL ARGUMENT**

14  **A.     <u>Summary Judgment Standard</u>**

15          The Court shall grant summary judgment if no genuine dispute of material fact exists

16  and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

17  moving party bears the initial burden of demonstrating the absence of a genuine issue of

18  material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it might

19  affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477

20  U.S. 242, 248 (1986).  The adverse party must present affirmative evidence, which "is to be

21  believed" and from which all "justifiable inferences" are to be favorably drawn. *Anderson*, 477

22  at 255, 257.

23

24  PLAINTIFFS' BRIEF IN OPPOSITION
    3:18-CV-05267-RBL

25  Page 11 of 24
    ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet
    files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

26

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

**B.**      **The Fourth Amendment.**

The Fourth Amendment prohibits law enforcement officers from using "objectively unreasonable" force to "seize" a person. *Rodriguez v. Swartz*, 899 F.3d 719, 728–29 (9th Cir. 2018); *Torres v. City of Madera*, 648 F.3d 1119, 1121 (9th Cir. 2011). And apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment. *Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991) (citing *Tennessee v. Garner*, supra 471 U.S. at 7). The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Torres*, 648 F.3rd at 1201, citing *Graham v. Connor*, 490 U.S. 386, 396 (1989). However, in evaluating the nature and quality of the intrusion on a plaintiff's Fourth Amendment interests, the Court must consider "the type and amount of force inflicted". *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir.1994).

The court's inquiry therefore is "whether the totality of circumstances, (taking into consideration the facts and circumstances of the particular case including the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether he is actively resisting arrest or attempting to evade by flight) justified the particular type of seizure." *Torres*, 648 F.3rd at 1201, quoting *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). Courts have now gone further and held that even when a felony suspect tries to escape, "where the suspect poses no immediate threat to the officer and no threat to others, the harm from failing to apprehend him does not justify the use of

PLAINTIFFS' BRIEF IN OPPOSITION
3:18-CV-05267-RBL
Page 12 of 24
ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet
files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1   deadly force to do so." *Rodriguez v. Swartz*, 899 F.3d at 729, quoting *Tennessee v. Garner*, 471

2   U.S. 1, 11 (1985).   Pertinent to the present matter, the 9th Circuit has expressly held that

3   "[E]very reasonable law enforcement officer should know that 'officers may not shoot to kill

4   unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is

5   fleeing **and** his escape will result in a serious threat of injury to persons.'" *Id.*, quoting *Harris*

6
    *v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997) (Emphasis added).   And "whenever
7
    practicable, a warning must be given before deadly force is employed." *Id. Garner,* 471 U.S.
8
9   at 11-12.

10       1.   **Deadly Force Used Against Plaintiffs Violated the Fourth Amendment.**

11          Viewing the facts in the light most favorable to the Plaintiffs, Officer Donald's

12  conduct of shooting two men who were trying to flee clearly violated the Fourth

13  Amendment.

14
            Here, Mr. Chaplin engaged in misdemeanor shoplifting.   He was caught as he tried to
15
16  steal beer, and Mr. Chaplin and Mr. Thompson ran from security before the police arrived.

17  When Officer Donald later attempted to detain the two brothers, they again ran to avoid

18  confrontation, to avoid detention.   They did not purposely, actively attack an armed police

19  officer.   They did not physically engage with Officer Donald, whom they believed was going

20  to cite them for shoplifting.   They did what they did before: they ran.   They had no idea

21
    Officer Donald was going to start firing his weapon, into the pavement three times and once
22
23  in their direction, as they fled to get away from him.

24  PLAINTIFFS' BRIEF IN OPPOSITION
    3:18-CV-05267-RBL
25  Page 13 of 24
    ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet
26  files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

Because warning shots are against Department policy, Officer Donald, had no choice but to concoct an outrageous story about how he was attacked and almost struck with a skateboard to justify the warning shots into the pavement.  He knew this behavior is expressly unreasonable under the *Rodriguez v. Swartz* evaluation.  Because warning shots are not permitted, he had to figure out a way to explain how/why he used deadly force against two men with skateboards when he was never struck with a skateboard, when he didn't have a mark on him, when neither men sustained a bullet wound during the first volley of shots near the patrol vehicle.

Over the course of five days, Officer Donald concocted a story of how he was attacked unexpectedly, how he was bent over at a 45 degree angle, how he was spun around, how he could not defend himself from Mr. Thompson, how all the years of self-defense training was all for naught, as Mr. Chaplin tried to strike his head with the skateboard.  The physical evidence at the scene, however, contradicted his elaborate story of the first encounter.  The location of the spent cartridge casings refuted his allegations.  The State's own firearms expert and crime scene reconstruction expert from the Washington State Patrol Crime Lab contradicted his claims.

After the first volley of shots, Officer Donald testified he had lost sight of them because the area was so extremely dark and so poorly illuminated.  Nevertheless, Officer

PLAINTIFFS' BRIEF IN OPPOSITION
3:18-CV-05267-RBL
Page 14 of 24
ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet
files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1    Donald did not wait for backup.[4]  He ran after them, telling dispatch he saw them running

2    into the wood line.  When Officer Evers arrived at the scene with his emergency lights on,

3    he observed Officer Donald shining his flashlight into the woods with his gun drawn and

4    ready to fire.  Ready and waiting.

5        Less than two minutes later, Officer Donald shot Mr. Chaplin four times.  He shot

6    Mr. Chaplin as he emerged from the woods, running away from Officer Evers and Officer

7    Luck O'Brien. He shot Mr. Chaplin because Mr. Chaplin did not heed his command to stop,

8    to get down.  He shot Mr. Chaplin without ever warning that he would be shot.  Then he

9    shot Mr. Thompson – who was clearly unarmed. He shot Mr. Thompson as he stood in the

10   center of the road shouting for his brother, "Bro!"  "Bro!"  "Bro!" after he saw his brother

11

12   shot down.  Who yelled, "Why the f*** did you shoot my brother!"

13       Officer Donald claimed Mr. Thompson was reaching for his weapon.  He shot

14   because he feared Mr. Thompson who was so close would grab his gun and use it against

15   him.  However, Mr. Thompson's shirt (which the police did *not* send to the crime lab for

16   gunshot residue analysis) was analyzed by defense expert Mr. Kay Sweeney.  The shirt, which

17

18   should have had gunshot residue if Mr. Thompson was less than 48 inches from muzzle of

19   the gun, had no evidence of gunshot residue at all.  More importantly, Dr. Lacy determined

20

21   [4] Of import is that on May 13, 2013, Officer Donald failed to call for backup in an encounter which was
     later identified by his superior as a concern because it was "becoming a recurring theme for Officer
22   Donald", as was his going "hands on" with multiple suspects.  The supervisor planned to monitor Officer
     Donald's tactics and make sure his future shift supervisors were aware of the concerns. ***Decl. of Ko, Ex.***
23   ***"Q".***

24   PLAINTIFFS' BRIEF IN OPPOSITION                          **DAVIES PEARSON**, P.C.
     3:18-CV-05267-RBL                                              ATTORNEYS AT LAW
25   Page 15 of 24                                          920 FAWCETT -- P.O. BOX 1657
     ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet        TACOMA, WASHINGTON 98401
     files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx          TELEPHONE (253) 620-1500
26                                                            TOLL-FREE (800) 439-1112
                                                                    FAX (253) 572-3052

1   the injury to Mr. Chaplin's spinal column was "immediately incapacitating," thus refuting the

2   evidence that Mr. Chaplin stumbled a couple feet and rolled from side to side, ending up

3   over 20 feet away from the center line where Officer Donald claimed he fired his weapon.

4           By shooting Mr. Chaplin multiple times when he posed no immediate threat to

5   Officer Donald or others, when he was running away to avoid confrontation, when Officer

6   Donald knew the only crime he'd been involved in was a minor theft incident where no one

7   was hurt or injured, Officer Donald used excessive force to seize Mr. Chaplin.  By shooting

8   Mr. Thompson when he posed no immediate threat to Officer Donald or others, when he

9   was not actively fleeing from Officer Donald, when Officer Donald had other less lethal

10  weapons at his disposal, Officer Donald used excessive force, thus violating Mr.

11  Thompson's Fourth Amendment right to be free from unreasonable seizure.

12          In light of the voluminous conflicting testimony and evidence, summary judgment

13  should be denied.  It is up to a jury to decide whose testimony is more credible, more

14  reliable; whose testimony is consistent with and comports with the forensic evidence.

15

16

17  C.      **There Can Be No Qualified Immunity When Relevant Facts Are In Dispute.**

18          Qualified immunity attaches to an officer's actions unless two questions can be

19  answers in the affirmative:  1) Was the law governing the official's conduct clearly

20  established? 2) Under that law, could a reasonable officer have believed the conduct was

21  lawful?  *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997).   Here, the 9th circuit has

22

23

24  PLAINTIFFS' BRIEF IN OPPOSITION
    3:18-CV-05267-RBL

25  Page 16 of 24
    ml c:\users\nlucente\appdata\local\microsoft\windows\temporary internet

26  files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1 already addressed the issue of shooting at fleeing suspects and found it unlawful without an

2 immediate threat:

> 3 [E]very reasonable law enforcement officer should know that 'officers may
> 4 not shoot to kill unless, at a minimum, the suspect presents an immediate
> threat to the officer or others, or is fleeing and his escape will result in a
> 5 serious threat of injury to persons.'

6 *Rodriguez v. Swartz*, 899 F.3d at 729, quoting *Harris v. Roderick*, 126 F.3d 1189, 1201

7 (9th Cir. 1997).

8 **1. The Law Was Clearly Established.**

9 In *Tennessee v. Garner*, a fleeing suspect/Garner, stopped at a 6-feet-high chain link

10 fence at the edge of the yard.  With the aid of a flashlight, Officer Hymon was able to see

11

12 Garner's face and hand.  471 U.S. at 4.  He saw no sign of a weapon, and, though not

13 certain, was  "reasonably sure" and "figured" that Garner was unarmed. *Id.* While Garner

14 was crouched at the base of the fence, Officer Hymon called out, "police, halt" and took a

15 few steps toward him.  Garner then began to climb over the fence.  *Id.* Convinced that if

16 Garner made it over the fence he would elude capture, Officer Hymon shot him.  Garner

17 was shot in the head and was later pronounced dead at the operating table. *Id.* Garner had

18 stolen a purse and 10 dollars from a house.  *Id.*  The Court held "the use of deadly force to

19 prevent the escape of all felony suspects, whatever the circumstances, is constitutionally

20 unreasonable.  It is not better that all felony suspects die than that they escape.  Where the

21

22

23

24 PLAINTIFFS' BRIEF IN OPPOSITION
3:18-CV-05267-RBL
25 Page 17 of 24
ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet
26 files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1    suspect poses no immediate threat to the officer and no threat to others, the harm resulting

2    from failing to apprehend him does not justify the use of deadly force to do so." *Id.* at 11.

3        Recently, in *Glenn v. Washington County,* 673 F.3d 864 (9th Cir. 2011), the Court of

4    Appeals was asked to determine whether officers' use of beanbag shotgun (and subsequently

5    live ammo) on a victim after responding to the victim's mother's 911 for help with her

6    distraught and intoxicated son was a reasonable use of force.  The County argued that the

7    officers did not use unreasonable force, and that they had qualified immunity, and the trial

8    court dismissed plaintiffs' claims on appeal.  The 9th Circuit reversed, finding questions of

9
10   fact remained regarding the use of unreasonable force.  But it also discussed the qualified

11   immunity argument:

12           In evaluating a grant of qualified immunity, we ask two questions: (1)
             whether, taking the facts in the light most favorable to the nonmoving party,
13           the officers' conduct violated a constitutional right, and (2) whether the right
             was clearly established at the time of the alleged misconduct. *See Saucier v.*
14           *Katz,* 533 U.S. 194, 200–01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled*
             *in part by Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565
15           (2009). Either question may be addressed first, and if the answer to either is
             "no," then the officers cannot be held liable for damages. *See Pearson,* 555
16           U.S. at 236, 129 S.Ct. 808. In this case, the district court focused on whether
             the officers' use of force violated Lukus' Fourth Amendment rights, and held
17           that it did not. Glenn argues on appeal that the district court erred in
             granting summary judgment on that basis. We agree that genuine issues of
18           fact remain, and accordingly reverse. **We further conclude that resolution**
             **of these issues is critical to a proper determination of the officers'**
19           **entitlement to qualified immunity.** We express no opinion as to the
             second part of the qualified immunity analysis and remand that issue to the
20           district court for resolution after the material factual disputes have been
             determined by the jury.
21
22
23

24   PLAINTIFFS' BRIEF IN OPPOSITION
     3:18-CV-05267-RBL
25   Page 18 of 24
     ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet
26   files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1    *Glenn v. Washington Cty.*, 673 F.3d 864, 870 (9th Cir. 2011) (Emphasis added).

2           Defendants argue that this court should find qualified immunity, relying on *Kisela v.*

3    *Hughes*, 138 S. Ct., 1148 (2018).   *Kisela*, however, is clearly distinguishable from this case in

4    every aspect.   The most significant difference is that in *Kisela,* the facts viewed in the light

5    most favorable to Hughes failed to establish that the police officer had notice that a specific

6    use of force was unlawful.  138 S. Ct., at 1151.  It was undisputed that police responded to a

7    report of a woman engaging in erratic behavior.  When police arrived, they spotted a second

8    woman standing behind a locked chain-link fence separating her from the officers.  *Id.*  The

9    officers then saw another woman, Hughes, emerge from the house carrying a large knife at

10   her side.  Hughes matched the description of the woman who had been seen hacking a tree.

11   *Id.*  Hughes walked toward the second woman and stopped no more than sex feet from her.

12   The officers drew their guns and at least twice told her to drop the knife.  Though Hughes

13   appeared calm, she did not acknowledge the officers' presence or drop the knife.  *Id.*  One of

14   the officer dropped to the ground and shot Hughes four times through the fence.  Hughes

15   was later treated for non-life-threatening injuries. *Id.*

16          Without reaching the question of whether excessive force was used, the U.S.

17

18   Supreme Court found that the officer had qualified immunity because she had not violated a

19   clearly established, statutory or constitutional rights of which a reasonable person would

20   have known.  *Kisela*, at 1152.  The Court found, "This is far from an obvious case in which

21

22

23

24   PLAINTIFFS' BRIEF IN OPPOSITION
3:18-CV-05267-RBL
25   Page 19 of 24
ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet
26   files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

any competent officer would have known that shooting Hughes to protect Chadwich (second woman) would violate the Fourth Amendment." *Kisela,* at 1153.

Here, there are clear facts in dispute.  Officer Donald alleges he shot Mr. Chaplin because he feared Mr. Chaplin would injure him with his skateboard, and he claims he shot Mr. Thompson because he was reaching for his firearm.  Mr. Chaplin and Mr. Thompson deny these allegations.  Mr. Chaplin did not walk towards Officer Donald with his skateboard to strike him after Officer Donald had already fired his weapon.  Mr. Thompson was not on a suicide mission to grab Officer Donald's gun away from him.  He saw Officer Donald shoot his brother down.  He knew Officer Donald would shoot and kill him. Viewing the evidence in the light most favorable to the nonmoving party, a jury can certainly conclude Officer Donald is not to be believed and that he used excessive force when he shot and paralyzed Mr. Chaplin and shot Mr. Thompson.

Viewing the facts in the light most favorable to Mr. Chaplin, it would have been clear to Officer Donald and to all reasonable officers that using deadly force and firing his weapon multiple times at Mr. Chaplin as he emerged from the woods because he failed to heed his commands to stop and drop to the ground violated the Fourth Amendment.  Even under Officer Donald's version of events, Mr. Chaplin was more than 20 feet away from him when he stood up from his crouching position.  Officer Donald had numerous less lethal weapons at his disposal.  He had his taser; he had a knife; he had his OC spray; he had

PLAINTIFFS' BRIEF IN OPPOSITION
3:18-CV-05267-RBL
Page 20 of 24
ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet
files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1    had a flashlight he could have substituted for his baton.  He was well trained and well versed

2    in self-defense maneuvers.

3        Likewise, viewing the facts in the light most favorable to Mr. Thompson, it would

4    have been clear to Officer Donald and to all reasonable officers that using deadly force and

5    firing his weapon multiple times at Mr. Thompson who was clearly unarmed and had no

6    access to a weapon violated the Fourth Amendment.

7        Plaintiffs' position, based upon the testimony of their expert, Gregory Gilbertson,

8
     essentially is that Officer Donald's behavior was incompetent across the board in this matter:

9

10       The shooting and wounding of Bryson Chaplin and Andre Thompson by
         Olympia Police Officer Ryan Donald on May 21, 2015 was an
11       unreasonable use of excessive force when a number of intermediate force
         and control measures and less-lethal force and control measures were
12       immediately and readily available, and the use of deadly force employed
         by Officer Ryan Donald was not in compliance with the Olympia Police
13       Department Use of Force Policy and  Integrated Force Management Use
         of Force Model dated May 12, 2010.
14

15   ***Decl. of Ko, Ex. "32", at p. 7 (Emphasis in original).***

16       That alone should negate qualified immunity.  But is it also clear from the cases

17   cites that using deadly force against an unarmed, fleeing suspect, is unlawful, and to do so is

18   a knowing violation of the law.

19
         d.    **<u>The City is Liable For Its Wrongful Acts</u>**
20

21       Defendants argue that the City of Olympia bears no fault here under either the

22   theory of *respondeat superior* or due to ratification.  Although admittedly Plaintiffs have alleged

23

24   PLAINTIFFS' BRIEF IN OPPOSITION
     3:18-CV-05267-RBL
25   Page 21 of 24
     ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet
26   files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1    *respondeat superior* liability against the City for their § 1983 claims and their state law claims

2    (discussed below), Defendants ignore the fact that Plaintiffs allege direct violation of § 1983

3    by the City, and Plaintiffs' second cause of action specifically alleges Negligent Training,

4    Supervision, Discipline, and Retention against the City of Olympia.  (Dkt. No. 1).  These are

5    claims directly against the City arising out of its own acts or omissions, and Defendants have

6    raised no arguments that this cause of action should be dismissed.

7        As to Plaintiffs' §1983 claims, a municipality or other local government may be liable

8    under this section if the governmental body itself "subjects" a person to a deprivation of

9    rights or "causes" a person "to be subjected" to such deprivation. *Monell v. New York City*

10    *Dept. of Social Servs.,* 436 U.S. 658, (1978). While the City might not be vicariously liable for its

11    employees' actions, under § 1983, local governments are responsible for "their *own* illegal

12    acts." *Pembaur v. Cincinnati,* 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)

13    (citing *Monell,* 436 U.S., at 665–683, 98 S.Ct. 2018). *Connick v. Thompson*, 563 U.S. 51, 60, 131

14    S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011).  As noted in Footnote 3, Officer Donald's

15    superiors were aware of his repeated failure to wait for back up and his tendency to go

16    "hands on" in dealing with suspects.  There is no evidence to date that, despite this

17    knowledge, the City took any steps to prevent Officer Donald from acting in this manner

18    during his encounters with Mr. Thompson and Mr. Chaplin. ***Decl. of Ko, Ex. "17".***

19        Additionally, Plaintiffs' expert, Gregory Gilbertson, outlines the City's own negligent

20    acts and omissions:

21        The shooting and wounding of Bryson Chaplin and Andre Thompson by

22        Olympia Police Officer Ryan Donald on May 21, 2015 was the result of

        Olympia Police Department supervisory, command, and executive officers

23

24    PLAINTIFFS' BRIEF IN OPPOSITION
3:18-CV-05267-RBL

25    Page 22 of 24
ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet

26    files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1   summarily failing to adequately and effectively train, supervise, discipline, and
2   retain Officer Ryan Donald after Sergeant Allen documented to Lieutenant
    Raymond Holmes (Ret.) in a Memorandum dated May 13, 2013 of several
3   failures to meet department standards and ongoing concerns involving
    Officer Donald's use of force in other incidents, which were  personally
4   observed by Sergeant Allen and a number of un-named Olympia Police
    officers, who set forth their observations and concerns regarding Officer
5   Donald to Sergeant Allen on about April 13, 2013.

6   *Decl. of Ko, Ex. "32", p. 7.*

7   e.   **Plaintiffs' State Law Claims For Outrage, Negligence, and False Arrest**
         **Outrage:**
8

9   Outrage:  Defendants allege that the "shooting" here was "objectively reasonable"

10  and therefore there can be no outrage.  As with Defendants' other statements, there is no

11  agreement that the multiple shootings by Officer Donald were in any way reasonable.

12  Plaintiffs' position is that shooting at unarmed shoplifters fleeing away is shockingly

13  unreasonable.  The forensic evidence and the Declaration of Plaintiffs' expert Greg

14  Gilbertson, *Decl. of Ko, Ex. "32"*, support Plaintiffs' claims.  Summary judgment dismissing

15  Plaintiffs' claim for outrage should be denied.

16

17  Negligence:  There is clear and convincing evidence regarding negligence on the part

18  of the City of Olympia, as noted above.  This evidence is set forth in detail in the declaration

19  of Plaintiffs' expert, Greg Gilbertson.  See *Decl. of Ko, Ex "32", at pp. 7-8.*

20

21  False Arrest:   Plaintiffs do not object to dismissal of their claims for false arrest.

22

23

24  PLAINTIFFS' BRIEF IN OPPOSITION
    3:18-CV-05267-RBL
25  Page 23 of 24
    ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet
26  files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

## V.   CONCLUSION

There is significant evidence that by shooting Mr. Chaplin multiple times when he posed no immediate threat to Officer Donald and when Mr. Chaplin had only been involved in a minor theft incident where no one was hurt or injured, Officer Donald used excessive force, violating Mr. Chaplin's Fourth Amendment right to be free from unreasonable search and seizure.   There is also significant evidence that Officer Donald had other less lethal weapons at his disposal, and by shooting Mr. Thompson when he posed no immediate threat to Officer Donald and when he was not actively fleeting from Officer Donald, Officer Donald used excessive force, violating Mr. Thompson's Fourth Amendment right to be free from unreasonable search and seizure.   As there are genuine issues of material fact in dispute, Defendants' motion for summary judgment should be denied except as to Plaintiffs' claims for false arrest.

**DATED** this 3rd day of December, 2018.


By:___/S/  MONTE BERSANTE___  
   MONTE BERSANTE,  
   WSBA# 17083  

DAVIES PEARSON, P.C.  
920 Fawcett Avenue, PO Box 1657  
Tacoma, WA  98401  
Tel:  (253) 620-1500  
Fax: (253) 572-3052  
mbersante@dpearson.com  

By:_____/S/  SUNNI KO_____  
   SUNNI KO,  
   WSBA# 20425  

LAW OFFICES OF SUNNI KO  
1105 Tacoma Avenue South  
Tacoma, WA  98402  
Tel:  (253) 383-5346, x129  
Fax: (253) 572-6662  
sunni@sunnikolaw.com  

PLAINTIFFS' BRIEF IN OPPOSITION  
3:18-CV-05267-RBL  
Page 24 of 24  
ml c:\users\mlucente\appdata\local\microsoft\windows\temporary internet  
files\content.outlook\bunrarg1\final brief in opposition to sj final.final.docx

**DAVIES PEARSON, P.C.**  
ATTORNEYS AT LAW  
920 FAWCETT -- P.O. BOX 1657  
TACOMA, WASHINGTON 98401  
TELEPHONE (253) 620-1500  
TOLL-FREE (800) 439-1112  
FAX (253) 572-3052