Judge Ronald B. Leighton

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

ANDRE THOMPSON, a single man; and
BRYSON CHAPLIN, a single man,

                    Plaintiffs,

          vs.

CITY OF OLYMPIA,  a local government
entity; and RYAN DONALD and "JANE
DOE" DONALD, individually and the
marital community comprised thereof,

                    Defendants.

NO.  3:18-cv-05267

PLAINTIFFS' TRIAL BRIEF

## I.    INTRODUCTION

Plaintiffs Andre Thompson and Bryson Chaplin respectfully submit this Trial Brief to

the Court.  Following the Court's denial of Defendants' motions for summary judgment,

the following claims remain at issue for trial:

1.  Plaintiffs' §1983 claims against Defendant Officer Donald for his unreasonable

     use of deadly force;

PLAINTIFFS' TRIAL BRIEF
Page 1 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

2. Plaintiffs' §1983 claims against the City of Olympia for failing to adequately train its officers to handle usual and recurring situations with which they must deal and that the City's deliberate indifference to the obvious consequences of its failure to train was the moving force that caused the ultimate injury to the plaintiffs, in violation of U.S.C. 42, section 1983.

3. Plaintiffs' state law claim of negligence against Officer Donald for unreasonable tactical conduct and decisions leading up to the use of deadly force show, as part of the totality of circumstances, amounting to negligence.

4. Plaintiffs' state law claim for the tort of Outrage against both Defendants.

## II.      EXCESSIVE FORCE

On May 21, 2015 at approximately 1:00 a.m., Mr. Bryson Chaplin was caught attempting to steal beer from Safeway grocery store located in Olympia Washington. Mr. Andre Thompson accompanied Mr. Chaplin, but was not involved in the attempted theft. Police were called to the Safeway store, but Mr. Chaplin and Mr. Thompson had fled the scene before they arrived.

At approximately 1:14:57 a.m., Officer Donald reported to dispatch that he had spotted two men matching the description of the suspects walking with skateboards northbound on Cooper Point Rd.  The area where Officer Donald pulled over his patrol vehicle is residential with "low hanging trees" and "almost pitch black."

PLAINTIFFS' TRIAL BRIEF
Page 2 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052



Because Officer Donald had only turned on his driver's side spotlight and did not immediately identify himself as a police officer when he "asked" Plaintiffs to take a seat in front of his patrol vehicle, Mr. Thompson believed it was perhaps a campus security officer wanting to make contact. Wanting to avoid an encounter, Mr. Thompson and Mr. Chaplin began crossing Cooper Point Rd. when Thompson heard a male voice yell, "Stop" "Olympia Police."  Not wanting a confrontation, not wanting his brother arrested for shoplifting, wanting to avoid any contact with police, the two brothers began running north, away from Officer Donald. While running, they heard multiple gunshots.

A. **First Volley of Shots**

Unbeknownst to Officer Donald, **Ittika Frazier** and **Kaleigh Savage** whose home faced Cooper Point Road and whose upstairs bedroom window was later damaged

PLAINTIFFS' TRIAL BRIEF
Page 3 of 41
3:18-cv-05267

DAVIES PEARSON, P.C.
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

by a stray bullet from Officer Donald's gun were awake when they were alerted to sounds of gunfire outside their bedroom window.    Frazier told police:

> A.    And then I hear yelling and, uh, like a lot of.. .urn, like, uh, key sounds, like jiggling sounds. Because there's like no other sounds on the Cooper Point Road except when some body's walking and it's like you can only hear that. Right. Urn, ... and then jingling sounds. And then, uh, somebody saying, uh, "police! Stop! Police! Stop!" Um, and then like .. *.I just heard like ji-, like running sounds type and then the shots started going off* And, urn, ...

> Q:    So the jiggling sound like someone was running? Yeah.

Savage, told police:

> And we didn't really hear anything too much at first. It was really quiet. But, then we heard get on the ground, urn, really authorative, urn, guessing that was thepolice officer. Urn, and *then we kind of heard some scuttling around, like they could be running. Um, but then there was, I think, two or three gunshots at first.*

Officer Donald also initially told investigating officers immediately following the incident that Plaintiffs were "running" before the initial encounter near the patrol vehicle. Five days later, during his investigative interview with his guild attorney at his side, his story changed, however.  Now, the plaintiffs were "walking" past his patrol vehicle when he moved to the rear of his patrol vehicle to "meet up with them."

**Evidence at the Scene.**

When the investigative team arrived to document the evidence, they found three "linear" bullet strikes in the pavement at the rear of the patrol vehicle.

PLAINTIFFS' TRIAL BRIEF
Page 4 of 41
3:18-cv-05267

**DAVIES PEARSON**, P.C.
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052



Officers also located three spent cartridge casings on the passenger side of the patrol vehicle (#23, #24, plus one more) and one at the right rear corner (#2). It was later determined Officer Donald fired four shots while at the rear of the patrol vehicle.



**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1       Police also noted a "3 foot area in the grass behind the patrol vehicle that was

2  matted down" with "what appeared to be foot prints in the matted grass that appear" as

3  though "someone walked in the ditch between the vehicle and the fence."



13       Based on how the bullet fragments were imbedded in the roadway, the grassy

14  depression next to the fence line, the three spent casings on the passenger side of the

15  patrol vehicle, the location of the ejection portal on the right side of the firearm, the spent

16  casings ejecting to the right, crime scene reconstruction expert, **Kay Sweeney**,

17  determined if the shooter was standing in the grassy depression next to the fence line

18  firing in an easterly direction, the spent casings would land where they were located –

19  next to the passenger side of the patrol vehicle.

PLAINTIFFS' TRIAL BRIEF
Page 6 of 41
3:18-cv-05267

**DAVIES PEARSON**, P.C.
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052



Figure #11
Three small bullet impact craters in pavement; #3, #4, and #6.



Depressed grass area

Figure #13
Early Morning Photograph of Officer Donald's Parked Police Vehicle at Scene

Crater defect #3

The scene revealed Officer Donald fired three warning shots into the pavement and one shot in an unknown direction when Plaintiffs did not heed his command to stop and fled north on Cooper Point Rd.

**Donald's Story**

PLAINTIFFS' TRIAL BRIEF
Page 7 of 41
3:18-cv-05267

DAVIES PEARSON, P.C.
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1    In a desperate attempt to explain why there were three bullet strikes in the

2   roadway, why he later shot and paralyzed Chaplin and wounded Thompson, Officer

3   Donald concocted an elaborate story about how the Plaintiffs must have conspired to

4   murder him.  Thompson, though stumbling with alcohol intoxication, with the reflexes of

5   a cat, suddenly and unexpectedly grabbed his right arm while pushing him down at a "45

6   degree" angle with his left arm.  And as he was being held down by Thompson, Chaplin

7   raised his skateboard above his head, aiming the trucks of the skateboard perfectly in line

8   with Officer Donald's head.  (Donald's re-enactment).

9



10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   PLAINTIFFS' TRIAL BRIEF
     Page 8 of 41
25   3:18-cv-05267

26

DAVIES PEARSON, P.C.
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052



Fearing he was about to be killed if struck, unable to defend himself in any way, not able to lay one finger on Thompson as he was being overpowered, Officer Donald un-holstered his gun and fired four times  – one of the bullets wounding Chaplin's right arm (Donald's new theory of how Chaplin's arm was injured).   How did Chaplin's skateboard miss striking Thompson's arm/shoulder" if he/Chaplin "follow[ed] through with the swing"?  How did drunken Chaplin align the "trucks" of the skateboard perfectly with his head in such darkness?  How did the bullets miss Chaplin's torso when Officer

PLAINTIFFS' TRIAL BRIEF
Page 9 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

Donald was "aiming for center mass" with Chaplin standing only "two feet" away? How did three, bullet strikes end-up in the roadway if Donald fired all four shots in rapid succession? How did three, bullet strikes end-up in the roadway in linear fashion if Officer Donald was firing his gun while pushed/pulled in all direction and if he fired in the directions depicted below by Officer Donald?



Why did Officer Donald not fight back? Why did he not use his defensive maneuvers? How did intoxicated Thompson manage to overpower and hold Officer Donald down without Officer Donald defending himself? Questions jurors may ponder.

When defense expert **Kenton Wong** was asked how the spent casings could have landed on the passenger side of the patrol car if shots were fired in the manner depicted below, Wong replied:

> Whether there's enough movement and whether the expended cartridges casings, upon ejection, would have struck somebody's arm or somebody's shirt or

PLAINTIFFS' TRIAL BRIEF
Page 10 of 41
3:18-cv-05267

DAVIES PEARSON, P.C.
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

somebody's leg, I can't say. But if it flew unimpeded and did not strike anything as it was ejected from the ejection port, they would have landed in the grass.





PLAINTIFFS' TRIAL BRIEF
Page 11 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1   Many obstacles "impeded" the spent cartridge casings from landing on the other

2   side of Officer Donald's patrol vehicle:  Donald's face; Donald's head; his arm; his neck;

3   his shoulder; his chest; the rear of the patrol car; the car's bumper.

4   **Chaplin's Right Arm Wound**

5   Forensic scientists from the Washington State Patrol crime laboratory, Dr. John

6   Lacy, and Kay Sweeney will refute Officer Donald's new theory of how Chaplin's arm

7

8   became injured.

9   **Kathy Geil** who examined Chaplin's sweatshirt testified there were five bullet

10  holes in the back of his sweatshirt in "linear" fashion – meaning the holes were "all from

11  the same bullet and they are just flying in a general direction because the velocity and the

12  mass of that bullet is not going to be defected too much, unless it hits a significant

13  target."

14



15

16

17

18

19

20

21

22

23

24  PLAINTIFFS' TRIAL BRIEF
    Page 12 of 41

25  3:18-cv-05267

26

DAVIES PEARSON, P.C.
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1     Unlike the other entry bullet holes which were clearly circular, forensic scientist

2   **Margaret Barber** determined the right arm bullet holes were "mushroom" in shape and

3   size, consistent with a sweatshirt fragment from the right arm found at the location.



12     **Dr. John Lacy**, a medical examiner, also testified unequivocally that the wounds

13  on Chaplin's right arm were consistent with a "deformed bullet" fragment re-entering and

14  re-exiting.  He stated:

16          *"The wound is irregular in its shape.  It has a very asymmetric marginal*
            *abrasion.  It's size is unusual, and the location on the body should not*
17          *produce those change in the wound appearance, had the bullet been intact*
            *when its struck."*

**DAVIES PEARSON**, P.C.
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052



**Kay Sweeney**, by actually examining Bryson's sweatshirt and his undershirt, by reviewing Dr. Lacy's conclusion, by reviewing Ms. Barber's report, by reviewing Ms. Geil's statements, by reviewing the medical records, similarly determined the hollow-point bullet that entered Chaplin's back fragmented and exited – one small fragment damaging the sweatshirt and the larger fragment re-entering Chaplin's right arm before again exiting – causing the linear pattern on the sweatshirt consistent with the wounds/scars sustained by Chaplin.



PLAINTIFFS' TRIAL BRIEF
Page 14 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

B.  **Second Volley – Shooting of Chaplin**

It is undisputed Officer Donald shot Plaintiff Chaplin multiple times after he emerged from the woods.  It is undisputed that officers Paul Evers and Luke O'Brien were already at the scene before the second and third volley of shots were fired.  It is undisputed that when officers Evers and O'Brien ran towards Plaintiffs Chaplin and Thompson in the woods, Plaintiffs changed their direction and ran back in the direction from which they came.  It is undisputed Plaintiffs ran to get away from Evers and O'Brien.  It is also undisputed that Bryson was found approximately 20 feet from where Donald stated he was standing when he shot Bryson as he emerged from the woods.



PLAINTIFFS' TRIAL BRIEF
Page 15 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

Donald claimed that Bryson stumbled back a "few feet" and collapsed onto the road before he began rolling side to side. This testimony is contradicted by medical experts who opined the bullet that shattered Chaplin's vertebrae at T-11 would have resulted in Chaplin becoming immediately incapacitated. Dr. Lacy testified, "I think it's probably more likely than not that he would have collapsed right away."

**Dr. Seth Stankus** similarly determined:

> *"Within a reasonable degree of medical certainty, this injury would have caused an acute and complete spinal cord injury. This injury would have produced an immediate and complete loss of function of both lower extremities, a flaccid paraplegia. Mr. Chaplin would have been immediately incapacitated and fallen to the ground."*

Plaintiff Chaplin denies attempting to attack Officer Donald with his skateboard. In the darkness, he could not see where Officer Donald was standing when he emerged from the woods. He does not recall hearing Officer Donald's commands to stop, to get on the ground before being shot. He ran from officers Evers and O'Brien. He ran to get away from Officer Donald. He did not try to murder Officer Donald with his skateboard when there were other officers already at the scene right behind him.

## C. Third Volley – Shooting of Thompson

It is undisputed that Plaintiff Thompson was not armed with a weapon; was not reaching for a weapon; did not have anything in his hands that could be used as a weapon; did not have anything in his hands that could be mistaken for a weapon; did not have on a coat that could hide a weapon.

PLAINTIFFS' TRIAL BRIEF
Page 16 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1   Plaintiff Thompson admits yelling at Officer Donald after witnessing Donald

2   shoot his brother multiple times.  He admits yelling, "Bro! Bro! Bro!" after his brother

3   fell to the ground and he heard his brother's painful cries.  He admits yelling, "Why did

4   you shoot my brother?"  "Are you going to kill me too?"  He admits yelling profanities at

5   Officer Donald.  He admits not getting down as ordered by Officer Donald.

6

7   Plaintiff Thompson denies Officer Donald warning he will shoot.  No civilian

8   witness heard Officer Donald give warning he would shoot.  He denies attempting to

9   disarm Officer Donald.  He was not on a suicide mission to take away Officer Donald's

10  gun and kill Officer Donald – especially with other officers at the scene right behind him.

11  Officer Donald claimed he shot Thompson because he feared Thompson would

12  disarm him.  He claimed Thompson was so close, he could see Thompson's eyes "target

13  glancing" his weapon.  So close Thompson's hand was about to grab his gun.  So close

14  Thompson's torso was "three feet" from the muzzle of his gun.  He had no choice but to

15  shoot.

16

17  [Why did he not re-holster his gun to better retain it as taught at the academy?

18  Why did he not transition to a less lethal force?]

19

20

21

22

23

24  PLAINTIFFS' TRIAL BRIEF
    Page 17 of 41
25  3:18-cv-05267

26

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052



(Donald's re-enactment).

   Contrary to Donald's story, firearm examiner Kathy Geil determined that the drop-off distance of the gun particle residue was 48 inches.  Sweeney who later examined Thompson's T-shirt under a microscope concluded there were no gunshot residue particles on Thompson's white T-shirt.  Meaning, Thompson was more than 48 inches/four feet away from the muzzle of Officer Donald's gun.  [Detective Claridge never sent Thompson's T-shirt to the crime lab for gunshot residue analysis.  Kenton Wong never examined the T-shirt for gunshot residue].

   Kenton Wong opined maybe the wind blew the particles away; maybe the rain washed it away.  It was not raining that night.  It was not windy that night.  And very unlikely Thompson's blood would have gotten rid of every single piece, every scintilla of gunshot particle.

PLAINTIFFS' TRIAL BRIEF
Page 18 of 41
3:18-cv-05267

DAVIES PEARSON, P.C.
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

### D.  Donald had time to transition to less lethal force.

When asked why he did not transition to less lethal force to apprehend Chaplin and Thompson, Officer Donald replied *"[He] had [his] firearm out, and it was much easier."*  He added, he could not transition because "*The pace at which [Thompson] was advancing on me, it was impossible for me to transition to another force tool, to holster my weapon.*"

When confronted at his deposition and when he realized he actually had 28 seconds to either holster his gun or transition to less lethal force, he claimed:

- ■  *I have a 100% failure rate with my Taser.  The one time I did use my Taser, it was ineffective.*" [Not true.]
- ■  *I also have a hundred percent failure rate using a bean bag shotgun, as well.*  [Not true.]
- ■  *OC has a very high ineffective rate.*  [Not true.]

In fact, his own police practice expert, **Jeffrey Paynter,** insisted the tools are NOT ineffective and added, "No officer would believe that."

### E.  Donald did not understand when he could use deadly force.

General Order 1.3 in effect during May 2015 strictly defined when deadly force may be employed.  Paragraph 1.3.2(I) reads:

Deadly force may be employed only when necessary to protect the officer or others from what he/she reasonably believes is an immediate threat of death or serious physical injury.

PLAINTIFFS' TRIAL BRIEF
Page 19 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

Serious physical injury (as described in RCW 9A.04.110) is defined as "**an injury that involves substantial risk of death, major permanent disfigurement, or protracted loss/impairment of the function of any bodily part or organ.**"

During his deposition, Officer Donald was asked a series of questions, starting with the definition of "serious physical injury."  He answered:

> *I couldn't tell you what the – what the law definition is, but anything that could cause you serious physical pain.  It could be a number of things.*

When asked if the OPD policy defines serious physical injury as "substantial risk of death, major permanent disfigurement, or protracted loss/impairment of a function of any bodily part or organ," Donald responded:

> *I have not seen that policy.  I can't tell you what the policy is.*

Further questioning revealed that Donald's understanding of "serious physical pain" completely contradicted what is in the protocol.  When asked:

> *Q:*      *Officer Donald, when he grabbed your arm and he was*
> *pushing you down, were you thinking that you were*
> *going to be serious-- you were going to suffer serious physical injury?*

> *A:*      *Absolutely.*

Thinking Donald must have misunderstood the question and giving him the opportunity to reflect before answering, he was again asked.

> *Q:*      *The question officer was whether you believed when he grabbed your*
> *arm and put his hand, the other hand, on your back and pushing you*

PLAINTIFFS' TRIAL BRIEF
Page 20 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

*down, whether you believed you were suffering or going to suffer serious physical injury?*

Again, Donald did not disappoint.   Without a moment's pause or hesitation, Donald stated:

A:      *Absolutely. I don't know why else you would assault a police officer, let alone anybody, rather than -- other than to cause them injury.*

*Q:*      *Mr. Thompson, as he was allegedly walking towards you yelling, and screaming, and visibly upset, at that point was there threat of serious physical injury as he's walking towards you?*

A:      *There absolutely could have been.*

Officer Donald believes he can shoot anyone who is walking towards him yelling and screaming and visible upset, because there "could be" serious physical injury. Either because Officer Donald was never properly trained or because he is too obtuse to retain the information, Donald did not know prior to discharging his weapon multiple times that he can only shoot his gun when he himself or another is in "substantial risk of death, major permanent disfigurement, or protracted loss/impairment of a function of any bodily part or organ."   According to Officer Donald, an officer has discretion to shoot or to transition to less lethal force, and he was merely exercising his discretion.   "*I used my discretion.*"

## III.      *Monell* CLAIM

Prior to May 21, 2015, the City knew Officer Donald had a problem when responding alone:  he did not wait for back-up; by acting alone, he escalated the situation to where

PLAINTIFFS' TRIAL BRIEF
Page 21 of 41
3:18-cv-05267

DAVIES PEARSON, P.C.
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

force was inevitable; he prematurely withdrew his gun when deadly force was clearly not necessary; he did not attend training or was not tested for proficiency as required. Having knowledge, the City was deliberately indifferent to Officer Donald's shortcomings.   Ultimately, Officer Donald's shortcomings and the City's failure to adequately train resulted in Officer Donald shooting his gun because "it was easier." It was easier to just shoot two men who did not heed his commands to get down, rather than wait 60 seconds for Officers Evers and O'Brien who were already at the scene and ready to assist.   It was easier to just shoot than to use less lethal force to apprehend the plaintiffs.

And the City's knowing failure to address Donald's habit of putting himself in perilous situations and then physically engaging suspects amounted to a training inadequacy so egregious that a constitutional violation was a highly predictable consequence under §1983.

## A. City had knowledge Donald had numerous issues as a Training Officer.

Olympia Police Department (OPD) hired Officer Donald on 11/1/2011.   He completed his probationary training officer status (PTO) in May 2013.   The Olympia Police Department had knowledge that Officer Donald had issues relating to his competence as an officer, his capacity to control his emotion, and his ability to exercise sound judgment, because there were clear warning signs prior to May 2015.

PLAINTIFFS' TRIAL BRIEF
Page 22 of 41
3:18-cv-05267

DAVIES PEARSON, P.C.
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

■ 4/18/2012 -- Off Donald believed he could **"pick and choose"** the use of force he should use or use the "highest level of enforcement allowed.

Donald's responses to the level of enforcement that should be used:

*"The best way to resolve the issue is to be firm and consider the highest level of enforcement allowed, rather than encourage them [homeless people] to leave the area, expecting that you will not have any further problems in the future."*

*Is this what you believe or what you are being taught?  What factors might one take into consideration before engaging in "the highest level of enforcement allowed?"

This is what I'm being taught, in my opinion, from other officers.  *Like I've been instructed several times already, I should pick and choose what way I like doing things, and in what ways I will differ from how I see things being handled.*

■ 4/23/12023 -- **Off Donald lacked Defensive Tactics (DT) skills and was in need of additional training.**

Question:  They were somewhat surprised by the lack of variety of techniques the academy taught you.  Would you like to receive additional DT training?

Donald response:  *"Yes, without a doubt I would like to attend more defensive tactics training if it becomes available."*

***Donald, however, failed to attend three (3) DT training courses in 2015 prior to the incident in May 2015.

■ 4/27/2012 – **Off Donald was failing to include "important facts" in his reports.**

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

- **Off Donald did not respond to criticisms appropriately during debriefings.**

  Donald and I debriefed this call several times; **each time we spoke about the call it became evident we still didn't fully understand the call's various components.  I could tell Donald was frustrated during our debriefs because he grew more and more pensive and less communicative.**

- **5/6/2012 – Off Donald's ability to recall the incident was not accurate.**

  **There were concerns that Off Donald's memory of events as recited by Officer Donald were not accurate.**

- **5/20/2012 – Off Donald could not adequately communicate with other responding officers.**

- **5/31/2012 – Off Donald continued to struggle communicating with other officers when responding.**

- **6/14/2012  -- Off Donald had issues regarding situational awareness and officer safety:**

  **Off Donald continued to react emotionally and inappropriately when responding to a call regarding subject with a gun:**

- **6/22/2012 Mid-Term Evaluation**

  **Off Donald struggled with report writing.**

  Officer Donald struggles in this area.  He has had numerous rejected reports in the past.  Upon my review the reports were rejected for lack of content and description.

PLAINTIFFS' TRIAL BRIEF
Page 24 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

- ■ **Off Donald was not competent when Problem Solving.**

    After several observations at different incidents I conclude that he struggles with Problem Solving.  He begins to think it through but fails to communicate with other Officers about his process or what he intends to do.

- ■ **7/29/2012 -- Off Donald lacked sufficient skills in interacting with "different groups/types of people."  Off Donald continued to struggle with report writing.**

- ■ **8/20/2012 – Off Donald struggled with responding appropriately to lessen situations getting out of control.**

- ■ **8/25/2012 – Sgt. Costello and Training Officer B. Wylie found Off Donald's "extreme emotional response" inappropriate.**

- ■ **12/18/2012   -- Off Donald continued to fail to notify dispatch when responding and failed to wait for backup.**

    **Donald did not inform Dispatch that he was contacting a male subject.  Donald did not ask for a second unit.  He failed to call the subject out, but rather closed the distance.**

Incidents outlined above and more were never noted in Off Donald's Progress Reports dated Sept 2012 to March 2013.  The Progress Reports all contained glowing remarks about how great Off Donald performing as a training officer.

    B. <u>**By not waiting for back-up, Officer Donald placed himself in situations where use of force was "inevitable", it failed to provide Donald with adequate and necessary training.  The City was fully aware.**</u>

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1

2
    1.   Sergeant Allen Memo

3
      In his memo to **Lieutenant Holmes** dated April 13, 2013, Sergeant Allen detailed

4
his concerns regarding Off Donald:

5

6
> I am concerned that this is becoming a **reoccurring theme** for Officer Donald.  I
> am aware of other incidents (disorderly in bars – extracting one suspect from a

7
> vehicle with other suspects still present in the car) where he acted alone in
> situations where common sense and sound Police tactics call for more than one

8
> Officer.  In these prior instances, he was confronted by fellow Police Officers, but

9
> the behavior has seemed to continue.

10
(Emphasis added).  Sgt Allen voiced two concerns:

11

12
> (1) Officer Donald did not wait for back up, and placed himself in a
>     position where the use of force was inevitable.

13
> (2) Once Officer Donald was in that position, he made the decision to go

14
>     "hands on" with the aggressive suspect, exposing himself to attack
>     from the other three suspects that were present.

15

16
    **Sergeant Matt Renschler** later noted in Off Donald's April 30, 2013

17
Performance Review:

18

19
> Officer Donald received counseling for taking independent action and failing to
> wait for back-up during potentially dangerous situation earlier in the year. Several

20
> of his reports were rejected by various supervisors for being unclear or lacking
> sufficient detail. He needs to continue his efforts to improve communication skills

21
> with various members of the public and document incidents in clear, detailed
> reports.

22
    The Board of Evaluators (BOE) highlighted:

23

24
PLAINTIFFS' TRIAL BRIEF
Page 26 of 41
3:18-cv-05267

25

26

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

It is the opinion of the Board of Evaluators (BOE) that Officer Donald may, on occasion, have **difficulty taking feedback and/or input from more senior officers (peers).** It was said that at times he acts as if he is **"done learning."** Officer Donald also occasionally **engages in independent actions which have the potential of placing himself and/or other officers in danger**. There are performance areas needing improvement but none so serious that it would cause the BOE undue concern at this time. He has been, and will continue to be, counseled about these things if they continue to be issues.

(Emphasis added).

Though Sergeant Allen identified the problems he recognized in Officer Donald and had reported his concerns to Lt Holmes, though the evaluators had knowledge that Officer Donald engaged in conduct which potentially placed himself or other officers in danger, there is no record of Officer Donald receiving any type of follow-up training related to Off Donald "engaging in independent actions which have the potential of placing himself and/or other officers in danger." Rather, the OPD simply "*counseled*" Off Donald, expecting the problem to be solved. When questioned, Officer Donald confirmed he never received additional training after he was counseled and had no recollection of ever even seeing this memo. In fact, Officer Donald disagreed he did anything wrong.

According to Scott Defoe, "Anything short of termination should have included additional training and discipline to address the issues supervisors/evaluators noted during probationary status."

**2.   January 7, 2014 Incident:**

PLAINTIFFS' TRIAL BRIEF
Page 27 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

On January 7, 2014, Donald was again involved in an incident where force was used without waiting for backup.   Lt. Ray Holmes in his memo to the Deputy Chief Nelson wrote:

> Another area of concern relates to Officer Donald's independent action during the second contact with the male . . . . Officer Donald placed himself in a predicament when he encountered Mr. Davis without a second officer.
>
> Officer Donald did recognize that he needed additional units once Mr. Davis displayed hostile and uncooperative behavior.   The goal is to get Officer Donald to understand that timing is essential when requesting a cover unit during citizen contacts.   Specifically, that it is better to recognize non-compliant behavior and requesting another unit prior to engaging alone.

There is no record of Officer Donald receiving additional/particularized training related to this issue.

C.  **The City failed to properly train Officer Donald and was deliberately indifferent to his failures, which was the moving force behind the excessive force used.**

1.  Defensive Tactics Training:   According to the 2008 Use of Force General Order (effective May 21, 2015), officers were required to participate in annual defensive tactics training. 1.4.3.(III(B)(1)).   It reads:

> Each officer shall be proficient in the use of the defensive tactics and the devices employed therein.
>
> a. Participation in defensive tactics training sessions is mandatory for all officers except those subject to alternative training. [see 1.4.5]
>
> b. Nonparticipation in any defensive tactics training session is reported to an employee's supervisor.

PLAINTIFFS' TRIAL BRIEF
Page 28 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

> Annual defensive tactics training includes review of the Department's force model and its application. [see 1.3.1(III)]
>
> Chemical agents instructors conduct all defensive tactics training related to use of oleoresin capsicum (OC) and/or other chemical agents.
>
> Less-lethal weapons instructors conduct all training related to use of the Taser conducted energy weapon.

There is no record of Officer Ryan Donald attending Defensive Tactics Training on 8/6/14, 8/20/14, 2/17/15, 3/4/15, and 3/18/15.  It is safe to assume Off Donald failed to attend all five training sessions.

Had Officer Donald attended his defensive tactics training, he would not have felt it was "easier" to use his gun, rather than use less lethal force.  Had Officer Donald attended his defensive tactics training, he would have had more confidence in the effectiveness of less lethal force, such as his OC spray or his Taser, and would have learned how to transition from firearm to less lethal force or to retain his gun in its holster.

3.   2014 Gun Incident

On August 19, 2014, while responding to an incident involving a simple assault, Officer Donald saw the suspect "exit[ing] the front door of the house pulling a suit case, still yelling back toward the front of the house" that she was leaving.  When the suspect

PLAINTIFFS' TRIAL BRIEF
Page 29 of 41
3:18-cv-05267

DAVIES PEARSON, P.C.
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

"ignored [his] presence," Officer Donald "unholstered [his] firearm, keeping it in a low ready position, and told V/Shadduck to stop and show [him] her hands." In response, the suspect raised her hands, yelling, "F*** you – shoot me!"

During debriefing, the supervisor noted:

I debriefed the incident privately with Officer Donald, and specifically discussed my concerns about his decision to unholster his firearm and have it in the "low ready" position, as described in his report, absent articulable concerns of a potential deadly force encounter. Despite my concerns about his tactics, I do not believe it was a violation of policy.

Mr. Defoe:

It is my opinion that by not providing additional training to Officer Donald in the use of force policy, by not correcting his behavior as mandated by its own policy, and by not recognizing that Officer Ryan Donald's behavior related to the use of deadly force violated General Order 1.3, the Olympia Police Department failed in its duty to insure that Officer Donald followed the use of force policy pursuant to its protocol.

4.  Warning before shooting.

OPD Use of Force Policy in effect in 2015 last revised on 11/19/2012, did not inform its officers, including Donald, that a warning should be given prior to using deadly force.  In the 2017 policy, it reads:  "***Under these circumstances, if feasible, some warning should be given***."  Defense police practice expert, Paynter, was startled to learn a warning provision did not appear in the Use of Force policy in effect during 2015.

PLAINTIFFS' TRIAL BRIEF
Page 30 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

It is disputed whether Officer Donald warned Plaintiff Chaplin and Thompson before firing his weapon.  Not one civilian witness reported hearing Officer Donald's warning to shoot, though many heard his commands to "Get down!"  "Stay down!"  Fellow officer Paul Evers who was present at the scene shortly before shots were fired did not report hearing warnings to shoot, though he heard Donald's other commands.

5.  <u>Donald did not attend CIT training for years 2014 and 2015.</u>

In 2013, Donald received CIT (Crisis Intervention Training) at the WA Criminal Justice Training Center.  Crisis Intervention training included "de-escalation, physical control tactics, less lethal and deadly force."  Students were required to bring their Taser holster.  However, there is no record that Donald attended or "passed" CIT training in 2014 or prior to the incident in 2015.  By not making sure Officer Donald attended CIT training, the City was deliberately indifferent to Officer Donald's failure to attend and "pass" Crisis Intervention Training.

6.  <u>City failed to properly train Officer Donald in the use of his Taser.</u>

OPD failed to adequately train Officer Donald in the use of CED/Taser in lieu of deadly force.  As a result, Officer Donald failed to deploy his Taser -- a less lethal force – when he had ample opportunity to do so before resorting to deadly force.

■  General Policy in effect prior to May 21, 2015 provided:

PLAINTIFFS' TRIAL BRIEF
Page 31 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

Officers are required to successfully complete department approved training conducted by a CED-certified instructor before being assigned a device.

**Annual refresher training in CED is mandatory.  During the annual refresher training, officers who are unable to demonstrate proficiency with the CED will not be authorized its continued use of the device until remedial training is successfully completed.**

Donald received 3 training sessions on the use of CED.  Once on 8/22/2012, another on 4/17/2013 and a 2-hr CED update (power-point presentation) on 11/26/2014 prior to May 2015.  **The records show he attended, but they do not show whether or not he was deemed qualified or that he demonstrated "proficiency" in the handling of the device.**

Donald testified he had no independent recollection of qualifying during his training sessions.

Further, in January 2014, the Department knew that its officers were "unclear as to whether CED (TASER) would have been authorized under OPD policy during various scenarios.  However, the Department not only failed to adequately train its officers in the use of Tasers, it did not purchase training Tasers until 2017 – two years after the incident in question.

**Training officers noted on January 22, 2014:**

*Officers were unclear as to whether CED (TASER) would have been authorized under OPD policy during various scenarios.*

PLAINTIFFS' TRIAL BRIEF
Page 32 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

**This problem persisted and was noted in February 2014.**

*Many officers chose to go hands on with uncooperative suspects in the felony crime scenario after being advised the suspect was possibly armed. There was general confusion regarding whether the use of the CED (TASER) in that scenario was within policy. Many officers acknowledged the need for training CED's for more realistic based CED training. More than one officer admittedly stated their transition from hand gun to CED probably would not have been as smooth as they performed it during the scenarios without training weapons.*

*A need to purchase training CED's and use blue guns during scenarios was identified.*

Despite (1) there being general confusion amongst the officer regarding whether the use of the CEW (TASER) in various scenarios was within policy; (2) the City being aware that many officers admitted to needing additional training in the use of CED's for more realistic based CED training; (3) the City  being aware that more than one officer admittedly stated their transition from hand gun to CED probably would not have been as smooth as they performed it during the scenarios without training weapons; and (4) the City being aware of the need to purchase training CED's and use blue guns during the scenarios presented to its officer, the City ignored and failed to properly train its officer in the use of CED's.  Thus, the City was deliberately indifferent to the need to further train in the use of CED/Tasers.  In fact, the City did not purchase training CED's until 2017 – two years after the incident in question.

> 7.  <u>OPD failed to adequately train Donald when dealing with multiple subjects while responding alone.</u>

PLAINTIFFS' TRIAL BRIEF
Page 33 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

- **January 2014 Defensive Tactics (DT)Training**

  - <u>2 officer team</u> DT mock scenes with 1 uncooperative assault suspect and 1 uncooperative obstructing subject. Passive and active resistance.
  - <u>2 officer team</u> DT mock scenes with 1 uncooperative assault suspect and 1 uncooperative obstructing subject. Active and assaultive resistance

After the training and while debriefing, training supervisors noted:

A need to provide further tactical training was identified as it pertains to the set up and execution of high-risk scenarios. While it was found that officers **loosely followed the tactical guidelines, it was found that poor planning and execution put officers in a position where they could be severely injured or the force needed to affect an arrest would be elevated given their decisions.**

- **February 19, 2014 -- training included**

  - 1-officer mock scenes with 1 uncooperative felony suspect and a second scene with an uncooperative misdemeanor suspect

  - 2-team officer scenarios

During the debriefing, the supervisors noted:

Several officer continued to modify the straight-arm bar technique under stress, by inappropriately using their legs to trip the suspect, which increases the risk of injury to themselves when applying the technique in the field. **Officers also continued to have difficulty transitioning to a different technique when the one they had originally attempted to apply was failing.**

- **August 6th and 20th 2014 Defensive Tactics Training [Donald did not attend].**

PLAINTIFFS' TRIAL BRIEF
Page 34 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

Officers had to engage with a non-compliant suspect who used static resistance to prevent officers from placing him under arrest. The exercise involved a "**pair of officers** to gain control and maintain control of the scene both verbally and physically when needed."

■ **October 1, 2014** – An 8-hour In Service training was held **involving a 2-officer team.**

8. <u>Officer Donald was inadequately trained in the use of "less-lethal shotgun" with bean-bag rounds.</u>

In order to qualify, Officers were required to demonstrate annually in the use of firearms, including the use of shotgun bean bag and "Pepperball." Records show that officers were not tested in the "Less Lethal" category until 2015, and Donald did not pass his qualifications in the use of bean bag shotgun until 5 months after the incident, 10/24/2015 and 10/16/2015 respectively. (Off Donald last qualified on May 13, 2014. Hence, Off Donald had not passed his annual qualifications test prior to May 21, 2015).

During the incident, Officer Donald did not consider or attempt to use his Bean-bag Shotgun. Defoe determined Donald should have/could have taken his bean-bag shotgun with him to use if necessary when he chased after the plaintiffs.

## IV.    STATE CLAIM OF NEGLIGENCE

Even if Officer Donald's story is to be believed, Police practice expert, Scott Defoe, determined Officer Donald used unreasonable police tactics when:

PLAINTIFFS' TRIAL BRIEF
Page 35 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

- He pulled his patrol vehicle facing Plaintiffs, rather than from the rear;

- He did not turn-on his emergency equipment when the area was pitch black with low hanging trees;

- He did not immediately identify himself as a police officer;

- He prematurely un-holstered his weapon;

- He did not wait for back-up when back-up officers were en-route;

- By not waiting for back-up when, according to Donald, Plaintiff Chaplin ran towards his patrol vehicle with his skateboard raised above his head as if to damage his patrol vehicle;

- He was a solo officer and he noticed they were "bigger and heavier" in stature;

- He moved from the driver's-side door to the rear of the patrol vehicle to "meet-up" with them;

- He did not use defensive maneuvers against Thompson if indeed he was grabbed and pushed;

- By not bringing his Asp baton to work;

- By not using defensive tactic to create distance during the altercation to use his OC spray or his Taser;

- By chasing after the plaintiffs rather than wait for back-up and K-9 officers;

PLAINTIFFS' TRIAL BRIEF
Page 36 of 41
3:18-cv-05267

DAVIES PEARSON, P.C.
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

- By prematurely un-holstering his gun and keeping it in low-ready position before Plaintiffs emerged from the woods, thus necessitating the need to transition to less lethal force;
- By not using less lethal force against Chaplin;
- By not using less lethal force against Thompson;
- By not exercising gun retention techniques before firing his weapon.

**Felony Conviction Superseded by Intervening Cause**

Plaintiff were convicted of one count of Assault in the 3rd Degree against Officer Donald.  Defendants will likely argue that this cause of action is unavailable to the Plaintiffs under RCW 4.24.420, which provides a defense to any action for damages for personal injury (notwithstanding an action under 42 U.S.C. § 1983) when the plaintiff is was engaged in the commission of a felony at the time of the injury.  However, the statute further requires that the felony be the proximate cause of the injury. RCW 4.24.420.  Proximate causation is not present when an independent, intervening act that could not reasonably have been foreseen by the defendant interrupts the causal chain. *Sluman v. State*, 418 P.3d 125, 150 (Wash. Ct. App. 2018).

That the Plaintiffs were convicted of assault in the third degree – a crime that requires only that the defendant intended to put Officer Donald in fear of bodily injury – supports that the Plaintiffs could not have reasonably foreseen that their conduct would result in Officer Donald's shooting them.  Accordingly, the evidence will show that the

PLAINTIFFS' TRIAL BRIEF
Page 37 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1    element of proximate cause in this defense is not met, and that the defense articulated

2    under RCW 4.24.420 is inapplicable.

3         Furthermore, Officer Donald used deadly excessive force on two occasions – once

4    at the rear of his patrol vehicle and again near the wood line north of Cooper Point Rd.

5    According to Defoe, Officer Donald was negligent in his tactics and decisions leading up

6
     to the firing of his weapon multiple times (once in the direction of fleeing suspects) at the
7
8    rear of his patrol vehicle.  In fact, the City's protocol strictly forbids firing of warning

9    shots.  Plaintiffs were not convicted of committing a felony during this earlier incident at

10   the rear of the patrol vehicle.  Hence, the felony defense rule is inapplicable as it relates

11   to this earlier incident.

12
                      V.      STATE CLAIM OF OUTRAGE
13
14        The tort of outrage requires the proof of three elements: (1) extreme and

15   outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3)

16   actual result to plaintiff of severe emotional distress. *Thomas v. Cannon*, 289 F.Supp.3d

17   1182, 1203 (W.D. Wash. 2018) (citing *Kloepfel v. Bokor*, 149 Wn.2d 192, 195, 66 P.3d

18   630 (2003)).

19
          Intentionally and recklessly firing warning shots into the pavement and once in
20
21   the direction of fleeing misdemeanor suspects is extreme and outrageous conduct.

22   Officer Donald knew when he fired those shots, the shots would cause emotional distress,

23   but he disregarded it.  In fact, the shots were fired with the specific purpose to cause

24   PLAINTIFFS' TRIAL BRIEF                          **DAVIES PEARSON, P.C.**
                                                       ATTORNEYS AT LAW
25   Page 38 of 41                                 920 FAWCETT -- P.O. BOX 1657
     3:18-cv-05267                                  TACOMA, WASHINGTON 98401
                                                     TELEPHONE (253) 620-1500
26                                                   TOLL-FREE (800) 439-1112
                                                        FAX (253) 572-3052

severe emotional distress.  To frighten them into submission.  To teach them a lesson they would never forget.  To let them know who was boss.

## VI.    DAMAGES

Mr. Chaplin and Mr. Thompson each seek general damages for their injuries caused by Officer Donald and the City of Olympia. Mr. Chaplin and Mr. Thompson do not seek economic damages in the form of past medical care, past wage loss or future loss of wages or earning capacity.  However, Mr. Chaplin seeks economic damages for future medical care, treatment and services, as well as necessary household help and expenses associated with his long term care needs.  Mr. Chaplin and Mr. Thompson also seek punitive damages for Defendant Donald's violation of the Plaintiffs' civil rights guaranteed by the United States Constitution. Finally, Mr. Chaplin and Mr. Thompson seek costs, expenses, and reasonable attorney's fees pursuant to all applicable statutory authority including, but not limited to 28 U.S.C. § 1920, 42 U.S.C. § 1988, and RCW 4.84, et seq., and any further relief as the court may deem just and equitable.

DATED this 3rd day of September, 2019.


By:     /s/  Sunni Ko
        SUNNI KO, WSBA# 20425

        LAW OFFICES OF SUNNI KO
        1105 Tacoma Avenue South
        Tacoma, WA  98402

PLAINTIFFS' TRIAL BRIEF
Page 39 of 41
3:18-cv-05267

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1

2

Tel:  (253) 383-5346, x129
Fax: (253) 572-6662
sunni@sunnikolaw.com

3

By:      /s/  Monte Bersante
MONTE BERSANTE, WSBA# 17083

4

BRIAN M. KING, WSBA# 29197

5

6

DAVIES PEARSON, P.C.
920 Fawcett Avenue, PO Box 1657

7

Tacoma, WA  98401
Tel:  (253) 620-1500

8

Fax: (253) 572-3052
mbersante@dpearson.com

9

bking@dpearson.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

PLAINTIFFS' TRIAL BRIEF

25

Page 40 of 41
3:18-cv-05267

26

**DAVIES PEARSON, P.C.**
ATTORNEYS AT LAW
920 FAWCETT -- P.O. BOX 1657
TACOMA, WASHINGTON 98401
TELEPHONE (253) 620-1500
TOLL-FREE (800) 439-1112
FAX (253) 572-3052

1

## CERTIFICATE OF SERVICE

2

3        The undersigned certifies that under penalty of perjury under the laws of the State
of Washington that on the below date I caused to be served the foregoing document on:

4

**Attorney for Defendants**

5   Andrew Cooley

6   Kimberly J. Waldbaum
Keating, Bucklin & McCormack, Inc., P.S.

7   801 Second Avenue, Suite 1210

8   Seattle, WA 98104
( ) Via U.S. Mail

9   ( ) Via Facsimile
( ) Via Hand Delivery

10  (X) Via Email

11

        **SIGNED** this 3rd day of September, 2019, at Tacoma, Washington.

12

13                                     /s/ *Marie Lucente*

14                                     Marie Lucente
                                       Legal Assistant to Monte Bersante

15

16

17

18

19

20

21

22

23

24  PLAINTIFFS' TRIAL BRIEF              **DAVIES PEARSON, P.C.**
                                          ATTORNEYS AT LAW
25  Page 41 of 41                       920 FAWCETT -- P.O. BOX 1657
    3:18-cv-05267                       TACOMA, WASHINGTON 98401
                                        TELEPHONE (253) 620-1500
26                                      TOLL-FREE (800) 439-1112
                                        FAX (253) 572-3052